IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KEVIN RUSSO,

        Plaintiff,

   v.

UNITED STATES OF AMERICA &
DEPARTMENT OF THE AIR FORCE,

        Defendants.

HON. JEROME B. SIMANDLE

Civil No. 05-5760 (JBS)

**<u>OPINION</u>**

APPEARANCES:

Drew M. Hurley, Esq.
17 East High Street
Somerville, NJ 08876
    Attorney for Plaintiff

Irene E. Dowdy, Assistant United States Attorney
OFFICE OF THE U.S. ATTORNEY
401 Market Street
Fourth Floor
P.O. Box 2098
Camden, NJ 08101
    Attorney for Defendants

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

This matter is before the Court upon Defendants' motion for partial summary judgment as to Count One of Plaintiff Kevin Russo's Complaint [Docket Item 32].  At the time the events underlying this lawsuit transpired, Plaintiff was a pilot in the Air Force Reserve, and was also employed as a commercial pilot by American Airlines ("AA").  In December 2003, Plaintiff's squadron commander communicated with AA about Plaintiff's active duty

military status, and AA subsequently terminated Plaintiff's
employment on account of the fact that Plaintiff had apparently
concealed from his employer his active duty status.  Plaintiff's
Complaint alleges, <u>inter</u> <u>alia</u>, that his commander's communication
of Plaintiff's active duty military status to AA violated the
Privacy Act, 5 U.S.C. § 552a, <u>et</u> <u>seq.</u>  Defendants have moved for
summary judgment as to Plaintiff's Privacy Act claim.  For the
reasons set forth herein, the Court will grant Defendants'
motion, holding that Defendants' disclosure of Plaintiff's active
duty military status to his civilian employer does not violate
the Privacy Act.

## II.  BACKGROUND

### A.  Facts

Plaintiff Kevin Russo became a member of the United States
Air Force Reserve in 1985, and was hired as a pilot by AA in
1986.  (Russo Dep. 27-28.)  By August 2003, Plaintiff's
responsibilities for AA consisted of flying "reserve bid
assignments," which meant in effect that he was "on call,"
subject to being contacted on short notice for flight
assignments.  (Defs.' Statement of Undisputed Material Facts
("SUMF") ¶ 7.)

Sometime between May 29, 2003 and August 25, 2003, Plaintiff
received an order from the Air Force Reserve informing him that
he had been assigned to a 270-day tour of active military duty,

2

with a reporting date of August 25, 2003 and a release date of
May 20, 2004.  (Defs.' SUMF ¶ 15; Pl.'s SUMF ¶ 1.)  Part of
Plaintiff's tour of duty required him to report to Altus Air
Force Base ("Altus AFB") in Oklahoma in order to attend training
sessions on piloting the Air Force's C-17 aircraft.  (Defs.' SUMF
¶ 16; Pl.'s SUMF ¶ 1.)  Plaintiff, thinking that he "could
actually work [his] military and [his AA] airline schedule
together" and that his active duty military status did not pose a
"conflict with American Airlines scheduling," did not inform AA
of his active military duty status.  (Defs.' SUMF ¶¶ 18-19; Pl.'s
SUMF ¶ 1.)

       In December 2003, Plaintiff's squadron commander at the
McGuire Air Force Base ("McGuire AFB") in New Jersey was Lt. Col.
Edward J. Callaghan, Jr.  (Defs.' SUMF ¶ 28; Pl.'s SUMF ¶ 10.)
On December 11, 2003, Callaghan was in his office at McGuire AFB
when he received an anonymous telephone call in which an
unidentified caller asked Callaghan whether Callaghan was aware
of the fact that Plaintiff had been flying for AA while he was at
Altus AFB.  (Pl.'s SUMF ¶ 11.)  Callaghan answered the
unidentified caller's questions, and when he subsequently asked
for the caller's name, the caller hung up.  (Id. at ¶ 12.)
Although the parties appear to dispute the sequence of the steps
Callaghan took following the anonymous telephone call – and
indeed whether an anonymous caller did in fact place a call to

3

Callaghan[1] – it is clear that Callaghan placed two telephone calls on December 11, 2003 after he allegedly spoke to the anonymous caller: one to AA, and one to Plaintiff.[2]  (Id. at ¶ 25; Defs.' SUMF ¶¶ 28, 35.)

Callaghan placed a call to AA's Flight Office at LaGuardia Airport on December 11, 2003, and spoke with Chief Pilot Rod Mauro.  (Defs.' SUMF ¶ 35; Pl.'s SUMF ¶ 1.)  Callaghan asked Mauro whether Plaintiff was an active employee of AA and whether Plaintiff had flown any trips for AA during the previous few months; Mauro answered both questions affirmatively.  (Defs.' SUMF ¶¶ 36-37; Pl.'s SUMF ¶ 1.)  Callaghan then asked Mauro whether AA permitted its pilots to fly trips for AA when they were on military leave; Mauro informed Callaghan that AA did not permit its pilots to do so.  (Defs.' SUMF ¶ 38; Pl.'s SUMF ¶ 1.)  Callaghan then stated to Mauro that the "anonymous complaint

---

[1]  Plaintiff argues that Callaghan's telephone records indicate that no anonymous telephone call was placed to Callaghan on December 11, 2003, and that Callaghan contacted AA on his own initiative.  (Pl.'s SUMF ¶ 13.)  As the following discussion makes clear, this fact, though disputed, is not material to the viability of Plaintiff's Privacy Act claim.

[2]  Although Callaghan testified during his deposition that he contacted Plaintiff before calling AA, Plaintiff argues that Callaghan's telephone records indicate that Callaghan contacted AA before speaking with Plaintiff.  (Pl.'s SUMF ¶ 25.)  Given that on summary judgment "the nonmoving party's evidence is to be believed and all justifiable inferences are to be drawn in [that party's] favor," Plaintiff's account of the disputed chronology will be accepted as true for purposes of deciding Defendants' motion.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (internal quotations and citations omitted).

4

alleging that Russo was still flying as an American A-300 Captain while being on active military duty orders" was under investigation by the Judge Advocate General.  (Defs.' SUMF ¶ 40; Pl.'s SUMF ¶ 1.)  Mauro requested that Callaghan fax him a copy of Plaintiff's military active duty orders; Callaghan obtained a copy of Plaintiff's active duty order, redacted Plaintiff's Social Security Number (but not his security clearance or his home address), and faxed the copy to Mauro.  (Defs.' SUMF ¶ 39; Pl.'s SUMF ¶ 1.)

On December 11, 2003, Callaghan also called Plaintiff and asked whether he had flown for AA while on active military leave, to which Plaintiff responded affirmatively.  (Defs.' SUMF ¶¶ 29-30; Pl.'s SUMF ¶ 1.)  According to Plaintiff, Callaghan then informed Plaintiff that "we may have a problem" and "abrupt[ly]" hung up.  (Defs.' SUMF ¶ 32; Pl.'s SUMF ¶ 1.)  After receiving Callaghan's telephone call, Plaintiff apparently believed that there might be a scheduling conflict between his military duties and his AA schedule, and later that day he called AA's Flight Office at LaGuardia Airport to request to be placed on military leave of absence for the remainder of December 2003.  (Defs.' SUMF ¶¶ 33-34; Pl.'s SUMF ¶ 1.)  Plaintiff spoke with Captain Bob Shore, AA's Director of Flights for New York, who told Plaintiff that he would need to verify the dates of Plaintiff's leave of absence.  (Defs.' SUMF ¶¶ 42-45; Pl.'s SUMF ¶ 2.)  Shore informed

5

Plaintiff that AA had already received "from [Plaintiff's] squadron" a copy of Plaintiff's active duty orders for the period beginning August 25, 2003, but requested that Plaintiff send "any additional orders" that he had. (Russo Dep. 149.) Plaintiff subsequently faxed Shore a copy of his flight orders for the month of December 2003, (id. at 150), and was placed on military leave of absence on December 12, 2003. (Defs.' SUMF ¶ 48; Pl.'s SUMF ¶ 2.)

Following the series of telephone calls on December 11, 2003, two significant occurrences took place. First, on March 24, 2004, AA terminated Plaintiff's employment. (Defs.' SUMF ¶ 55; Pl.'s SUMF ¶ 1.) AA's letter of termination to Plaintiff stated that

> [d]uring much of the time between the end of August and the beginning of November [of 2003] that you were showing available as a reserve pilot with American Airlines, you were attending training at Altus AFB in Oklahoma and would not have been able to fly a trip if assigned.
>
> . . . .
>
> During the period of time in question, at a minimum you misrepresented your ability to provide American Airlines with reserve availability[, which] . . . . allowed you to collect salary to which you were not entitled, as well as vacation and sick leave accruals to which you were similarly not entitled . . .

(Id.) Plaintiff grieved his termination through arbitration, and AA's decision to terminate Plaintiff was upheld. (Defs.' SUMF ¶ 57; Pl.'s SUMF ¶ 2.)

Second, in 2005, the Air Force Reserve Command Inspector

6

General's Office ("IGO") launched an investigation into a series
of complaints that Plaintiff had lodged against Callaghan and
other senior officers, which resulted in the production of an
initial investigatory report on August 24, 2005 (the "2005
Preliminary Report of Investigation" or "2005 Report").[3] (Defs.'
Reply Br. Ex. W.)  The IGO's preliminary investigation ultimately
led to the issuance of a report by the Air Force Inspector
General's Office in April 2007 (the "2007 Report of
Investigation" or "2007 Report").  (Pl.'s Opp'n Br. Ex. A.)  The
2007 Report addressed alleged abuses of authority that occurred
between January 30, 2004 and May 6, 2006.  (Id. at 6-9.)  The
2007 Report found that three of Plaintiff's six allegations
against Callaghan were substantiated, while three were not.  (Id.
at 81.)  The 2007 Report did not address the issue of whether
Callaghan's December 11, 2003 communications with AA violated the
Privacy Act.[4]

_____

[3] On February 14, 2008, the Court issued an Order [Docket
Item 44] sealing the contents of the Reserve Command Inspector
General's Office's initial report on its investigation, and
Plaintiff's opposition brief, in which he cited portions of that
report.  The discussion in text reveals in generic terms only the
portions of that sealed report that are relevant to the Privacy
Act issue at stake here.  The remainder properly continues to be
sealed as confidential investigatory materials not relied upon by
this Court.

[4] Unlike the 2007 Report, the preliminary 2005 Report did
address Plaintiff's allegations that Callaghan's December 11,
2003 communications violated the Privacy Act.  The 2005 Report
found that Callaghan's disclosure of Plaintiff's active duty
status did not violate the Privacy Act, because an employee's

**B.   Procedural History**

Plaintiff filed his Complaint in this action on December 8, 2005.  The Defendants are the United States, the Department of the Air Force, and Callaghan.  Plaintiff alleged that Callaghan's December 11, 2003 communications with AA violated the Privacy Act (Count One); that Callaghan improperly collected information from AA about Plaintiff (Count Two) and improperly maintained Plaintiff's disciplinary records (Count Three) in violation of the Privacy Act; that the United States breached its contract with Plaintiff (Count Four); and that Callaghan's communications with AA defamed Plaintiff (Count Five).

---

duty status can be released without consent without violating the Privacy Act.  (Defs.' Reply Br. Ex. W at 23.)  The 2005 Report likewise found that Callaghan did not improperly disclose Plaintiff's Social Security Number in his communications with AA, since Callaghan redacted that information before faxing Plaintiff's duty orders to AA.  (Id. at 24.)  The 2005 Report found that Callaghan did violate the Privacy Act by failing to redact Plaintiff's home address from the orders he faxed to AA, but determined that the "potential harm [from such a violation] would have been negligible as this was information Maj Russo would have already provided American."  (Id.)

On February 13, 2006, Harlan G. Wilder, the Chief of the Administrative Law Division of the Air Force Judge Advocate General reviewed the 2005 Report.  (Defs.' Reply Br. Ex. Z.)  Wilder upheld the majority of findings in the 2005 Report as legally sufficient, but determined that the investigation of Plaintiff's Privacy Act complaints were outside the Inspector General's authority.  (Id. at 10.)  On February 28, 2006, the Air Force Inspector General's Office referred Plaintiff's Privacy Act complaints to the Air Force Judge Advocate Civil Litigation Directorate.  (Defs.' Reply Br. Ex. BB.)  Plaintiff alleges that the omission of the Privacy Act charges from the 2007 Report resulted from the fact that "Air Force higher ups tried to cover up [the Privacy Act] finding by ordering it deleted."  (Pl.'s Opp'n Br. at 19 n.15.)

In its December 4, 2006 Order, the Court: (1) dismissed Counts Two and Three "without prejudice to Plaintiff's right to pursue these claims before the Air Force Board of Correction of Military Records"; (2) dismissed Count Five "without prejudice to Plaintiff's right to seek individual claims against Defendant Lt. Col. Callaghan if the Attorney General's Westfall Act certification is set aside"; and (3) denied the Government's motion to dismiss Count Four[5] but held that Plaintiff's claims in Count Four were "limited to a claim of less than $10,000 in damages pursuant to the Tucker Act, 28 U.S.C. § 1491." (Docket Item 25.)

Defendants moved for partial summary judgment as to Plaintiff's Privacy Act claim in Count One of the Complaint, the sole remaining claim.  The Court heard oral argument on Defendants' motion and reserved decision.

## III. DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence

---

[5] Plaintiff subsequently withdrew voluntarily the failure to promote claim contained in Count Four.

in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving
party's evidence 'is to be believed, and all justifiable
inferences are to be drawn in [that party's] favor.'" <u>Hunt v.
Cromartie</u>, 526 U.S. 541, 552, 119 S. Ct. 1545, 143 L. Ed. 2d 731
(1999) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  The threshold
inquiry is whether there are "any genuine factual issues that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party." <u>Liberty
Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining
Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable
inferences from the evidence, the nonmoving party may not, in the
face of a showing of a lack of a genuine issue, withstand summary
judgment by resting on mere allegations or denials in the
pleadings; rather, that party must set forth 'specific facts
showing that there is a genuine issue for trial,' else summary
judgment, 'if appropriate,' will be entered." <u>U.S. v. Premises
Known as 717 South Woodward Street, Allentown, Pa.</u>, 2 F.3d 529,
533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))(citations
omitted).

"Rule 56(c) mandates the entry of summary judgment, after
adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

### B.   Plaintiff's Privacy Act Claim

The sole issue presented for decision in Count One is whether Callaghan's statement to Mauro concerning Plaintiff's active duty military status, and the fax containing this information sent by Callaghan, violated the Privacy Act.  The only disclosure that is at issue in this case for purposes of Plaintiff's Privacy Act claim is Callaghan's disclosure of Plaintiff's active duty military status to Mauro and AA.[6]  The

---

[6]   Plaintiff has also suggested that Callaghan's fax violated the Privacy Act because it contained Plaintiff's Social Security Number.  At the May 12, 2008 hearing, Plaintiff conceded that Callaghan redacted Plaintiff's Social Security Number from the fax he sent to AA and that there was no evidence in the record suggesting that Callaghan otherwise disclosed Plaintiff's Social Security Number to any party.

In addition, Plaintiff has argued that Callaghan's statement to Mauro that Plaintiff was under investigation by the Judge Advocate General also violated the Privacy Act.  The Court agrees with Defendants that Plaintiff has adduced no evidence suggesting that the information communicated in Callaghan's statement regarding the supposed Judge Advocate General investigation was, at the time of Callaghan's communication, a "record contained in a system of records," as the Privacy Act requires.  <u>Quinn v.</u>

Court reviews the relevant provisions of the Act, the parties'
arguments, and its reasons for granting Defendants' motion for
summary judgment as to Count One of the Complaint below.

     1.   <u>The Privacy Act</u>

The Privacy Act of 1974 "safeguards the public from
unwarranted collection, maintenance, use and dissemination of
personal information contained in agency records." <u>Bartel v.
F.A.A.</u>, 725 F.2d 1403, 1407 (D.C. Cir. 1984). The Act contains a
non-disclosure provision that prohibits the disclosure of records
without the written consent of the individual to whom the record
pertains, 5 U.S.C. § 552a(b), and a civil enforcement provision
affording jurisdiction to the district courts of the United
States. § 552a(g)(1)(D). The Court of Appeals for the Third
Circuit has described the elements that a plaintiff must prove in
order to state a Privacy Act claim as follows:

> [I]n order to maintain a suit for damages under the
> catch-all provision of 5 U.S.C. § 552a(g)(1)(D) for a
> violation of the Act's central prohibition against
> disclosure, § 552a(b), a plaintiff must advance evidence
> to support a jury's finding of four necessary elements:
> (1) the information is covered by the Act as a "record"
> contained in a "system of records"; (2) the agency
> "disclose[d]" the information; (3) the disclosure had an
> "adverse effect" on the plaintiff (an element which
> separates itself into two components: (a) an adverse
> effect standing requirement and (b) a causal nexus
> between the disclosure and the adverse effect); and (4)

---

<u>Stone</u>, 978 F.2d 126, 131 (3d Cir. 1992) (quotations and citation
omitted). Callaghan's statement about an investigation might
bear upon Plaintiff's defamation claim, but it is not properly
the subject of a Privacy Act claim.

the disclosure was "willful or intentional."
Quinn v. Stone, 978 F.2d 126, 131 (3d Cir. 1992).

Significantly for purposes of this case, the Act's non-disclosure provision is subject to twelve exceptions, one of which Defendants argue is applicable to Callaghan's disclosure of Plaintiff's active duty status to Mauro.  Section 552a(b) of the Act prohibits a government agency from disclosing certain protected records without the consent of the individual to whom the record pertains unless such disclosure "would be . . . required under section 552 of this title."  § 552a(b).  Section 552, in turn, is the Freedom of Information Act ("FOIA"), which, inter alia, requires government agencies, "upon any request for records" that satisfies certain criteria, to make such records available to "any person," § 552(a)(3), except to the extent that such records fall under any of the FOIA's nine exemptions.  § 552(b).  The sixth FOIA exemption provides that "[t]his section does not apply to matters that are . . . personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  § 552(b)(6).

Although it concedes that Callaghan did not disclose Plaintiff's active duty status pursuant to an actual FOIA request, the Government argues that Callaghan's disclosure nonetheless fell within the ambit of § 552a(b)(2) – the Privacy

Act's FOIA exception – and thus did not run afoul of the Act's
non-disclosure provisions.  Plaintiff, by contrast, argues that §
552a(b)(2) does not create an exception to the Privacy Act's non-
disclosure requirements for all records that <u>would</u> <u>be</u> obtainable
under FOIA, but only for records that are actually the subject of
a written FOIA request.  The parties' arguments are set forth in
detail below.

### 2.   The Parties' Arguments

According to Defendants, § 552a(b)(2) exempts from the
Privacy Act's non-disclosure provision the disclosure of a record
that an agency would have to make available pursuant to a FOIA
request, regardless of whether an actual FOIA request for the
information has been submitted.  Defendants begin with the
legislative history of the Privacy Act, arguing that the 1974
House Report of its bill indicates that Congress did not intend
the Privacy Act to inhibit agencies' disclosure of non-sensitive
personal information.[7]  Rather, Defendants argue, the Act's

---

[7]  The relevant language in the House Report cited by
Defendants provides:

> The Committee does not desire that agencies cease making
> individually identifiable records open to the public,
> including the press, for inspection and copying.  On the
> contrary, it believes that the public interest requires
> the disclosure of some personal information.  Examples of
> such information are certain data about government
> licensees, and the names, titles, salaries, and duty
> stations of most Federal employees.  The Committee merely
> intends that agencies consider the disclosure of this
> type of information on a category-by-category basis and

exception for FOIA-accessible records merely requires that an agency "consider[], on a category-by-category basis, the types of information about its personnel that should be disclosed in the public interest, and . . . announce[] its determinations by published rule." (Defs.' Br. 18-19.)  According to Defendants, non-sensitive records falling within such categories are "presumptively disclosable" under the Privacy Act's FOIA-accessible records exception, whether or not an actual FOIA request for their disclosure has been made.  (Id. at 19.)  As Defendants note, the Air Force has promulgated rules[8] to address the types of information that are presumptively releasable without the subject's consent, and such rules consistently list as releasable a person's name, duty assignment, and military duty status.[9]  See 32 C.F.R. § 806b.45.

_____

allow by published rule only those disclosures which would not violate the spirit of the Freedom of Information Act by constituting "clearly unwarranted invasions of personal privacy."

H.R. 93-1416, 93d Cong. 2d Sess. at 13 (Oct. 2, 1974).

[8]  As Defendants note, the Final Rule containing § 806b.45 was published on January 7, 2004, although the publication listed the effective date as November 28, 2003.  69 FR 954 (Jan. 7, 2004).  Although the rule published on January 7, 2004 reorganized the contents of the disclosure policy, both the present and previous iterations list a person's name, duty assignment, and duty status as releasable information.  (Defs.' Br. Ex. R.)

[9]  By contrast, the Air Force has designated certain information to be "not releasable without the written consent of the subject," such as a home address or Social Security Number.

15

Defendants concede that in <u>Bartel v. F.A.A.</u>, 725 F.2d 1403 (D.C. Cir. 1984), the Court of Appeals for the District of Columbia Circuit considered the question of whether the Privacy Act's FOIA exception permits disclosure of potentially FOIA-accessible information "whether or not the information has been requested," and held that § 552a(b)(2) requires an actual FOIA request to trigger the exception.  725 F.2d at 1412 ("Only when the agency is faced with a FOIA request for information that is not within a FOIA exemption, and therefore has no discretion but to disclose the information, does the FOIA exception to the Privacy Act come into play.").  Defendants note, however, that the <u>Bartel</u> court recognized a possible "exception to this interpretation for information that is traditionally released by an agency to the public without a FOIA request," <u>id.</u> at 1413, and argue that a military employee's military status and duty assignment constitute such "traditionally released" information.

Defendants find support for this argument in guidelines issued by the Office of Management and Budget ("OMB") in the wake of <u>Bartel</u>, guidelines which Defendants argue are entitled to deference.  <u>See</u> <u>Quinn</u>, 978 F.2d at 133 ("OMB Guidelines are due the deference accorded to the interpretation of an agency charged

---

32 C.F.R. § 806b.44.  For information that does not fall under either § 806b.44 or § 806b.45, Air Force regulations direct the information custodian to "balance the public interest against the individual's probable loss of privacy."  § 806b.46.

with 'oversight' of implementation").  In guidelines published on April 20, 1987, the OMB noted that prior to <u>Bartel</u>, an agency's disclosure of potentially FOIA-accessible information "did not depend on the existence of a FOIA request for the records; the mere finding that no FOIA exemption could apply and that the agency would therefore have no choice but to disclose, was sufficient."  52 Fed. Reg. 12990, 12992 (Apr. 20, 1987).  The OMB emphasized <u>Bartel</u>'s traditionally-released-to-the-public exception to its FOIA-request-in-hand rule, and made the following recommendation with regard to "[r]ecords which clearly fall into the 'public domain' category":

> We suggest that these would be releasable either at the agency's initiation or in response to a FOIA request: the former because they are of the "traditionally released" class; the latter, because no FOIA exemption would prevent their disclosure.  An example would be the names and office telephone numbers of agency employees.  These are generally considered public information (obviously there may be exceptions for investigative and intelligence organizations), and the only applicable FOIA exemption, (b)(6), the personal privacy exemption, would not apply.  Thus, disclosures of an employee's name and office telephone number would be appropriate under Privacy Act section (b)(2).

<u>Id.</u>[10]  Because the information disclosed in this case fell within

---

[10]  Defendants also rely upon <u>Jafari v. Department of the Navy</u>, 728 F.2d 247 (4th Cir. 1984), in which the Court of Appeals for the Fourth Circuit addressed whether the Navy's disclosure of Jafari's non-attendance at a Navy training program, in response to a telephone request by Jafari's employer, violated the Privacy Act.  The <u>Jafari</u> court balanced Jafari's privacy interest in the information against "[t]he corporate employer's interest in the information here disclosed," and concluded that "under §§ 552(a) and 552(b)(6), the custodian of records here properly determined

the "traditionally released" category, Defendants argue that the
Privacy Act's FOIA exception is applicable here even in the
absence of an actual written FOIA request.

According to Plaintiff, "the FOIA exception to the Privacy
Act is totally inapplicable because where was <u>no</u> FOIA request
made for the information as to Russo's duty status." (Pl.'s
Opp'n Br. 29-30.) Plaintiff argues that the plain meaning of the
Privacy Act makes clear that an actual FOIA request must be made
before the exception contained in § 552a(b)(2) applies. <u>See</u> 5
U.S.C. § 552a(b)(2) ("No agency shall disclose any record which
is contained in a system of records . . . unless disclosure of
the record would be . . . required under section 552 of this
title"). Because nothing in the FOIA requires an agency to
gratuitously disclose personal data in the absence of a FOIA
request, Plaintiff argues, an actual FOIA request is a necessary
precondition in order for the exception contained in § 552a(b)(2)
to apply.

Plaintiff urges the Court to follow the holding of <u>Bartel</u>
that the FOIA exception to the Privacy Act comes into play
"[o]nly when the agency is faced with [an actual] FOIA request."
<u>Bartel</u>, 725 F.2d at 1412. Plaintiff argues that the <u>Bartel</u>

---

that, under the specific facts of the case, disclosure of the
information requested, though from 'personnel files' related to
Jafari, would not constitute a 'clearly unwarranted invasion of
personal privacy.'" <u>Id.</u> at 249.

court's reasoning is applicable to this case:

> The FOIA was meant to limit agency discretion to deny public access to information in its files.  The Privacy Act, on the other hand, was designed to limit agency discretion to reveal personal information in its files . . . [N]either statute was passed to increase agency discretion as to what to disclose or hold back.  It would be unreasonable to read the FOIA . . . as increasing agency discretion to disclose information where disclosure is otherwise prohibited by the Privacy Act.

Id. (internal citations omitted).[11]

> 3.  Analysis

As the Court explains below, it agrees with Defendants that Callaghan's disclosure of Plaintiff's military duty status did not violate the Privacy Act, because the disclosure fell within the scope of the Privacy Act's FOIA exception.  The Court will accordingly grant Defendants' motion for summary judgment as to Count One of the Complaint.

As a threshold matter, the Court disagrees with Plaintiff that the fact that the disclosure at issue in this case was not made pursuant to an actual written FOIA request is dispositive of the question of whether the Privacy Act's FOIA exception applies

---

[11]  Additionally, Plaintiff argues that Jafari, relied upon by Defendants, is distinguishable from the instant case on account of the court's reasoning in that case that "the person requesting the information positively identified himself as an agent of Jafari's civilian employer," and that the FOIA "generally requires the disclosure to any person of agency records properly requested by that person."  Jafari, 728 F.2d at 249 (internal quotations omitted).  In light of the fact that no records were requested in this case – properly or otherwise – Plaintiff argues that Jafari is inapplicable.

here.  The starting point for the Court's analysis is the text of
the Privacy Act itself.  See Rosenberg v. XM Ventures, 274 F.3d
137, 141 (3d Cir. 2001) ("Because it is presumed that Congress
expresses its intent through the ordinary meaning of its
language, every exercise of statutory interpretation begins with
an examination of the plain language of the statute.").

The Privacy Act's non-disclosure provision and FOIA
exception provide as follows:

> No agency shall disclose any record which is contained in
> a system of records by any means of communication to any
> person, or to another agency, except pursuant to a
> written request by, or with the prior written consent of,
> the individual to whom the record pertains, unless
> disclosure of the record would be –
>
> . . . .
>
> (2) required under [the FOIA].

5 U.S.C. § 552a(b) (emphasis added).  The Court finds that
Congress' use of conditional language here – creating an
exception where disclosure "would be . . . required under [the
FOIA]," id. – undermines Plaintiff's contention that an actual
written FOIA request is a necessary predicate for the
applicability of § 552a(b)(2).  If Congress had intended to
confine the reach of § 552a(b)(2) to actual written FOIA
requests, as opposed to the category of information that would be
discoverable through a FOIA request, then it could have expressed
that intent by using "is" in lieu of "would be" – i.e., "unless

the disclosure of the record is required under the FOIA."[12]   The
conditional language of § 552a(b)(2) casts serious doubt upon
Plaintiff's argument that the exception only applies where the
agency is faced with a written FOIA request.   In light of this
understanding of the statutory language, the Court is reluctant
to adopt the holding of Bartel that "[o]nly when the agency is
faced with a FOIA request for information that is not within a
FOIA exemption, and therefore has no discretion but to disclose
the information, does the FOIA exception to the Privacy Act come
into play."   Bartel, 725 F.2d at 1412.

Even if the Court were to follow Bartel as Plaintiff urges,
however, that authority would not justify a finding that the
disclosure at issue here violated the Privacy Act, because even
Bartel recognized an "exception to this interpretation for
information that is traditionally released by an agency to the
public without an FOIA request."   Id. at 1413.   That is, even
under Bartel, the question of whether a federal agency must
receive an actual written FOIA request before disclosing
information under the § 552a(b) exception depends on the type of

---

[12]   Nor does it appear that the use of "would be" was
necessary to make any of § 552a(b)'s other exceptions
intelligible.   See, e.g., 5 U.S.C. § 552a(b)(1) (creating an
exception where disclosure "would be . . . to those officers and
employees of the agency which maintains the record who have a
need for the record in the performance of their duties").
Indeed, Congress could have used "is" without changing the
meaning of any of § 552a(b)'s provisions except for the FOIA
exception.

information to be disclosed; if the information is "traditionally released by an agency to the public without a FOIA request," then the receipt of an actual FOIA request is not a necessary precondition for disclosure.  Id.

The Court finds that Mr. Russo's duty status is the sort of public-domain information traditionally released to the public in the absence of a FOIA request, and that the disclosure of such traditionally publicly available information would not "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), which means that the disclosure in this case did not violate the Privacy Act, irrespective of whether or not Bartel's reading of the Act is correct.  Several authorities support this conclusion.  First, the Court looks to the determination of the federal agency empowered to identify the classes of non-sensitive information traditionally releasable to the public.  Thus, Defendants argue that "as Congress intended, the Air Force has considered, on a category-by-category basis, the types of information about its personnel that should be disclosed in the public interest, and it has announced its determinations by public rule."[13]  (Defs.' Br. at 19.)  The

---

[13]  As the 1974 House Report to the bill that would become the Privacy Act stated,

The Committee does not desire that agencies cease making individually identifiable records open to the public, . . . . such [as] the names, titles, salaries, and duty stations of most Federal employees.  The Committee merely

current version of the Air Force's regulations on this subject, and all such regulations that have been in place since 1979, include among the list of "information normally releasable to the public without the written consent of the subject" records containing an individual's "[d]uty status of active, retired, or reserve," as well as, <u>inter alia</u>, records containing an individual's name, title, and salary.  32 C.F.R. § 806b.45.  The long history of making such non-sensitive data available to the public without the subject's consent suggests both that the disclosure of such information does not "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), and that the information falls within <u>Bartel</u>'s exception for "[r]ecords which have traditionally been considered to be in the public domain . . ."  <u>Bartel</u>, 725 F.2d at 1413 (citation omitted).

The Court also finds that these Air Force regulations are consistent with OMB regulations providing that "[r]ecords which clearly fall into the 'public domain' category," such as "the names and office telephone numbers of agency employees" are

---

intends that agencies consider the disclosure of this type of information on a category-by-category basis and allow by published rule only those disclosures which would not violate the spirit of the Freedom of Information Act by constituting "clearly unwarranted invasions of personal privacy."

H.R. 93-1416, 93d Cong. 2d Sess. at 13 (Oct. 2, 1974).

"releasable either at the agency's initiation or in response to a FOIA request: the former because they are of the 'traditionally released' class; the latter, because no FOIA exemption would prevent their disclosure." 52 Fed. Reg. at 12992. Plaintiff has offered no principled basis to support a finding that his duty status should be treated any differently than the categories of other non-sensitive information that the OMB found to be presumptively disclosable, with or without an actual written FOIA request. See Quinn, 978 F.2d at 133. The OMB's guidelines interpreting FOIA lie within its expertise as the federal entity charged with its oversight and implementation, and this Court gives this sensible interpretation deference.

Finally, the few courts to have addressed Privacy Act claims arising out of the disclosure of such traditionally released information without FOIA requests have held that such disclosures do not give rise to Privacy Act claims. Tripp v. Department of Defense, 193 F. Supp. 2d 229 (D.D.C. 2002), is on point. In that case, the plaintiff sued the Department of Defense ("DOD"), alleging in effect that the DOD's disclosure of the salary of a job for which she applied in the absence of an actual written FOIA request violated the Privacy Act. Id. at 235-36. The court rejected the plaintiff's argument and granted summary judgment to the DOD:

> The GS-level and salaries of public officials are "information . . . traditionally released by an agency to

24

the public without a FOIA request," <u>Bartel v. FAA</u>, 725
F.2d 1403, 1413 (D.C. Cir. 1984).  Therefore, even if
this information had been retrieved from a Privacy
Act-protected system of records, the government is not
prohibited from disclosing it pursuant to § 552a(b)(2);
<u>see also</u> H.R. 93-1416, 93d Cong. 2d Sess. at 13 (Oct. 2,
1974) (indicating that Congress did not intend the
Privacy Act to prohibit the disclosure to the public of
information such as "names, titles, salaries, and duty
stations of most Federal employees").  In <u>Bartel</u>, the
D.C. Circuit generally limited the application of §
552a(b)(2) to disclosures pursuant to an actual FOIA
request, but recognized the exception to this general
rule for information traditionally released to the public
without such a request.  The Court agrees that the names,
titles, salaries, and salary-levels of public employees
are information generally in the public domain.

<u>Id.</u> at 236; <u>see also</u> <u>National Western Life Ins. Co. v. United
States</u>, 512 F. Supp. 454, 461 (N.D. Tex. 1980) ("It cannot be
seriously contended that postal employees have an expectation of
privacy with respect to their names and duty stations"); <u>cf.</u>
<u>Jafari</u>, 728 F.2d at 249 (indicating support for proposition that
disclosure of duty status is not an unwarranted invasion of
privacy).  Once again, Plaintiff has not convinced the Court that
the disclosure of his duty status was somehow more invasive than
the disclosure at issue in <u>Tripp</u>, or that an individual's
military duty status was any less "in the public domain" than the
information disclosed in <u>Tripp</u>.  <u>Tripp</u>, 193 F. Supp. 2d at 236.

    The Court accordingly finds that Callaghan's disclosure of
Plaintiff's military duty status to Plaintiff's civilian employer
– the type of information that the Air Force has traditionally
found to be "releasable to the public without the written consent

of the subject," 32 C.F.R. § 806b.45 – did not violate the Privacy Act.  Defendants' motion for summary judgment as to Count One of the Complaint will thus be granted.

**IV.  CONCLUSION**

For the reasons discussed above, the Court will grant Defendants' motion for partial summary judgment.  The accompanying Order will be entered.


**September 3, 2008**                           **s/ Jerome B. Simandle**
Date                                            JEROME B. SIMANDLE
                                                United States District Judge


26